## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| KATIE M. SELKOW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 8:11-CV-00456-VMC-EAJ |
| | ) | |
| 7-ELEVEN, INC., | ) | **Memorandum Opposing Defendant's** |
| | ) | **Motion for Summary Judgment** |
| Defendant. | ) | |
| | ) | |

### Summary of Argument In Opposition

Plaintiff notified Defendant's, store manager, Alex Powell ("Powell"), that she was pregnant on or about February 11, 2010. Subsequently, Defendant's store manager and field consultant, Jacob McLeod ("McLeod"), advised Plaintiff that she was going to be transferred to a store that has a female manager because she was pregnant and they felt she would be more comfortable at that store. Plaintiff was told that the store was a more physically demanding store.

Plaintiff was transferred to the new store and advised the Defendant's store manager, Kirsten Goodnow ("Goodnow"), that she was pregnant her first day at the new store. On April 24, 2010 or May 1, 2010, Goodnow left a note for Plaintiff to scan the beer in the cooler. Plaintiff proceeded to scan the beer in the cooler, but needed assistance moving the heavy items around because of her pregnancy so she asked her co-worker Aaron Goodin ("Goodin") for assistance. Plaintiff advised her assistant manager, Bryan Simonet ("Simonet"), on her next shift, that she was going to need help lifting heavy

items because she was pregnant.   Plaintiff was terminated the next shift she saw Goodnow, i.e., May 4, 2010.

On the date of termination, Goodnow accused Plaintiff of her drawer being short back in March $600 to 800 and that she stole because she needed the money because she was pregnant and her boyfriend was out of work.   She also accused Plaintiff of stealing $10 and showed her the surveillance video which Plaintiff refuted explaining to Goodnow that the video doesn't show her stealing and that she was crazy to think she would steal because she was pregnant.

Plaintiff has presented "direct evidence" of discrimination in that the basis behind Defendant's belief that Plaintiff stole was because she needed money because she was pregnant. Defendant's manger, Goodnow, even accused Plaintiff's drawer of being short back in March $600 to $800 because she needed the money because she was pregnant. These accusations were directly related to Plaintiff's pregnancy. Subsequently, Defendant's manager left a note for Plaintiff to scan the beer in the cooler, which numerous employees have stated that they do not think that job is appropriate for an employee who is five months pregnant.

Alternatively, if the court were to view the above evidence as only circumstantial evidence, then following *McDonnell Douglas* case, Defendant's proffered reason for termination is pre-textual because it was based upon a sorely deficient investigation which was insufficient to reasonably justify and form an honest and good faith belief that Plaintiff stole money. Defendant's basis for termination was the viewing of a unreliable surveillance video, which freezes and omits video footage for roughly four and half

2

seconds. Defendant's position is pre-textual as Plaintiff's manager, an admitted expert in previously viewing over one thousand videos, did not conduct an adequate and good faith investigation of the video. Furthermore, Defendant has not even been able to establish the amount that Plaintiff's drawer was short the day of the alleged theft.

Defendant caught a male employee, Ryan Coffrin, playing scratch-off tickets before paying for them. Coffrin would pay for the tickets after he won. Defendant has taken the position that they have a *zero tolerance* when it comes to theft, which would mean they there is no managerial discretion utilized by its mangers and it is an *automatic termination*. All deponents, when asked the question, admitted that they would consider playing scratch-off tickets before paying for them as stealing. However, Coffrin was never terminated, nor even written up for the incident.

### Statement of Facts

Plaintiff was discriminated against because she was pregnant and was terminated on May 4, 2010. (*Selkow Dep. 1.* 13:7-10, Oct. 17, 2011). Plaintiff alleges the transfer to the new store was the start of the pregnancy discrimination because she was told she would be more comfortable with a female manger at the new store and was being transferred to a more physically demanding store even though she was pregnant. (*Id.,* 13:14-14:2, 38:4-13, 48:7-24).

Plaintiff advised her store manager and immediate supervisor, Powell, that she was pregnant on February 11, 2010 or her next shift after her doctor's appointment. (*Id.,* 15:7-17, 16:1-17:1-9, 22:16-20). Plaintiff was transferred to the new store and advised the store manager, Kirsten Goodnow, ("Goodnow") that she was pregnant on her first

day. (*Id.,* 50:6-22). Goodnow admits that she was aware Plaintiff was pregnant when she terminated her employment. (*Goodnow Dep.,* 118:23-25).

On April 24 or May 1, 2010, Goodnow left a note for Plaintiff to scan the beer in the cooler. (*Selkow Dep.,* 58:5-24, 61:3-6). Plaintiff was working with Aaron Goodin. (*Id.* 59:18-22). The beer is stacked on top of each other and on wheelie pads or on the shelf which goes 2 to 3 feet deep. (*Id.*) Moving the beer around requires some lifting and then moving the wheelie pads, because they can topple. (*Id.*) Plaintiff was scanning the beer in the cooler and asked her co-worker, Goodin, to help her with some of the lifting so that she could scan the beer. (*Id.,* 67:10-22). Plaintiff doesn't remember whether Goodin complained but thinks he may have said, "You know, I don't really have time to help you, I have to do the register and stuff." (*Id.*)

Plaintiff advised her assistant manager, Bryan Simonet ("Simonet"), on her next shift that she was going to need help lifting heavy items, that she was five months pregnant, that she had some trouble Friday and that she had to ask Aaron for help. (*Id.,* 69:0-70:-17). Simonet, as assistant manager, reported directly to his manager, Goodnow. Plaintiff was terminated the very next shift she saw Goodnow. Management was put on notice that Plaintiff requested help with lifting heavy items.

**Goodnow admitted that lifting up to 50 lbs. is not an essential part of the job duties.** (*Id.,* 75:25-76:3) Goodnow also admitted that Plaintiff asking for help would not create an undue hardship on the store. (*Id.,* 61:23-62:5). Goodnow does not believe a case of beer is that heavy and goes onto state that *"two 12-packs is a case, so that's what, three, under five pounds."* (*Id.,* 79:9-80-18). Goodnow does not believe a pregnant

4

women should have any problem lifting 12-packs of beer and went on to state that she lifted a keg of beer when she was seven months pregnant. (*Id.,* 81:7-14). However, then Goodnow admits that had she known Plaintiff was *five* months pregnant and Goodin was working, she would have opted to ask Goodin to scan the beer rather than Plaintiff. (*Id.,* 115:2-13). Plaintiff testified that she told Goodnow that she was pregnant on her first day at the new store. (*Selkow Dep.,* 50:6-22). Accordingly, Goodnow would have been aware that Plaintiff was roughly five months pregnant at the time she made the request.

Plaintiff's, co-worker, Goodin, testified that the beer was often disorganized, could be stacked up to 10 feet high, and if one were required to scan the beer and it was unorganized, it would require one to lift cases of beer around, which would of course require heavy lifting. (*Goodin Dep.* 19:1-22:22, 28:14-17). Goodin testified that he did not think it's appropriate for Defendant to assign Plaintiff, whom was five months pregnant, to multi-locate (scan) beer in the cooler if she were not provided assistance. (*Goodin Dep.,* 29:6-10).     Matt Hoffman, another co-worker said the same thing. (*Hoffman Dep.* 31:17-22, 35:4-36:1 Jan. 20, 2012).   Ryan Coffrin, another co-worker, also said the same thing.   (*Coffrin Dep.* 24:22- 25:11 Jan. 20, 2012). Even Powell, Plaintiff's prior manager, would not assign the task of scanning beer in the cooler to an employee who is pregnant. (*Powell Dep.,* 39:23-40:3 Dec. 15, 2011).

Goodnow terminated Plaintiff's employment on May 4, 2010. (*Selkow Dep.,* 77:10-12).  Plaintiff was told at her termination meeting that her drawer was short $600 to $800 back in March because Plaintiff was pregnant and her boyfriend was out of work. (*Id.,* 75:19-25). Goodnow showed Plaintiff a surveillance video allegedly depicting

Plaintiff stealing $10 and Plaintiff denied taking the money. (*Id.*, 79:10-81:9). Furthermore, Plaintiff stated that the video does not show her taking any money. (*Id.*).

Defendant argues that Plaintiff admitted at her deposition that she could understand how Goodnow could have watched the video and thought she put money in her pocket. Defendant has taken Plaintiff's statements out of context as Plaintiff was asked, "Could you understand how Kirsten would have watched it and ***originally thought*** that you had put the money in your pocket?" (*Selkow Dep.*, 83:5-7). Plaintiff was also asked, "Could you understand ***at first blush*** how Goodnow would think possibly you put the money in your pocket?" (*Id.*). An inadequate investigation and cursory review of the video to an untrained eye, such as Plaintiff's, at her termination meeting at which she was obviously under great stress, might lead such a person to draw that conclusion at first blush. Plaintiff was only given the opportunity to take a cursory glance at the video at the time of her termination and did not have the opportunity that her manger had to make a reasonable and good faith review of the video.[1] Furthermore, Defendant's manager had more than an untrained eye in reviewing surveillance videos as set forth below.

Defendant had a motive to terminate Plaintiff because she was pregnant and was unable to lift heavy items. Defendant's alleged non-discriminatory proffered reason for Plaintiff's termination is that Goodnow viewed a surveillance video which allegedly depicted Plaintiff taking $10 from a customer and placing it in her pocket.  As set forth

---

[1] At the time of Plaintiff's deposition, Plaintiff and its counsel were unaware that a surveillance video was still in existence as it was not disclosed in Defendants Initial Disclosures and wasn't disclosed until Plaintiff's Supplemental Disclosures on December 13, 2011.

below, Defendant's proffered reason for termination is pre-textual such that a reasonable

fact-finder would find it unworthy of credence.

Kirsten Goodnow's deposition was re-taken on February 9, 2012 for the purposes

of examining the surveillance video.[2]  Goodnow testified that she has probably viewed

over a thousand surveillance videos over her career.  (*Goodnow Dep 2.*, 6:7-15 Feb. 9,

2012).  Goodnow knew that the surveillance videos sometimes stop (or becomes still) if

the camera doesn't sense motion.  (*Id.*, 6:16-7:7).  Goodnow is familiar with the

surveillance program, knew how to enlarge the video, slow it down, pause the video and

operate the volume.  (*Id.*, 8:6-25.)  Goodnow testified that the video does not show the

drawer open and close.  (*Id.*, 13:3-24).  Thus, Goodnow takes the position that the drawer

did not open and close.  However, Goodnow admits that the register automatically opens

when you have a gas cash sale as in the case at bar.  (*Id.*).  Goodnow then assumes that the

cash register did not open because Plaintiff had her finger against it.  (*Id.*)  Watching from

the Public View angle, Goodnow admits in her deposition that she notices the video

become still at the point in question.  (*Id.*, 18:7-20:16).  Goodnow admits that she noticed

this when she initially first watched the surveillance video.  (*Id.*)  When asked if this

caused her concern, Goodnow explains that is why she watched Register 2 View.  (*Id.*)

---

[2] Defendant did not disclose in its Initial Disclosures that it had in its possession a video surveillance
showing Plaintiff allegedly stealing.  On November 7, 2011 Plaintiff first learned verbally that a
surveillance video existed.  On November 8, 2011, Plaintiff served a Request for Production on Defendant.
On December 13, 2011, Defendant supplemented its Disclosures to specifically include the surveillance
video of April 30, 2011. Plaintiff first viewed the surveillance video on the morning of December 15, 2011
prior to deposing Defendants' witnesses.  Plaintiff's counsel did not have adequate time to view the video
prior to the depositions of Goodnow, Simonet and McLeod which were all taken on December 15 and 16,
2011.   Accordingly, Plaintiff was not permitted to re-depose any of the deponents regarding the
surveillance video, except Ms. Goodnow and therefore, is unaware as to what their position would be
regarding the surveillance video freezing for roughly 4 ½ seconds at the time of the alleged theft.

Goodnow then watches Register 2 View and is asked if she also notices that the video become still and she admits that the video does become still. (*Id.,* 21:22-25). Goodnow is asked again whether that caused her any concern and her answer was no. (*Id.,* 22:1-3). Plaintiff submits that a reasonable manager acting in good faith, let alone a manger with substantial experience as Goodnow, would have concern when the video becomes still at the exact time of the alleged theft.

Goodnow states that the audio volume normally comes on when watching the video. (*Id.,* 22:21-23:6). Goodnow then listened to the video with volume and admitted she could hear the register open and close. (*Id.,* 23:18-24:5). Goodnow watched the Public View again and was then asked if she could see that the video was still at the time that she heard the register open and close and she admitted that it looked like that to her. (*Id.,* 25: 4-23). Then Goodnow watched the Register 2 View with the volume on and was asked whether it was obvious to her that at the time she heard the register open and close, the video is still and she admitted that seems to be the case. (*Id.,* 26:13-17).

Then Goodnow, watching the Public View, was asked to see if she saw Plaintiff move back from the register when she hears the register open and close and Goodnow admitted that it seemed that Plaintiff was standing back away from the register at that time. (*Id.,* 26:25-27:11). Goodnow was then asked to watch the Register 2 View, and was asked the same question and she admitted that it appeared that Plaintiff was away from the register when she heard it open and close. (*Id.,* 28:3-8). Goodnow's prior testimony that the register didn't open and close because Plaintiff was holding her finger against it is contrary to hearing the drawer open and close. (*Id.,* 13:22-24). A reasonable

8

fact-finder could find that Goodnow's testimony is not believable because one can hear the drawer open and close and you can see that Plaintiff is standing back from the register at the exact time that you hear it open and close.

At Goodnow's deposition, the two frames of the surveillance video in question were examined – the frames right before and right after the gap in the video. (*Id.*, 32:24-33:17). Goodnow was shown frame 20:04:**25.248** from the Register 2 View and confirmed that Plaintiff was holding the money in her left hand. (*Id.*, 33:19-34:2). Goodnow was shown the very next frame, 20:04:**29.978 (4.730 seconds later),** and she confirmed that this frame depicted Plaintiff turned to the left and her hand either in her pocket or near her pocket. (*Id.*, 34:3-10). Goodnow then confirmed that **Exhibit "A",**[3] was the same printout of what was on the screen. (*Id.*, 34:11-35:8). Goodnow was then handed **Exhibit "B",** which are the two frames in question on Exhibit "A," showing the 4.730 second lapse between the two frames. (*Id.*, 37:3-13). Goodnow admitted that there is a 4.730 second lapse between the frames. (*Id.*, 37:15-18). Goodnow would not admit that a 4.730 seconds lapse is unusual. (*Id.*, 37:199-22). Goodnow admitted that a lot could happen in 4.7 seconds. (*Id.*, 37:23-25). When asked if 4.7 seconds was enough time for Plaintiff to open the register, place $10 in the register, and close the register, Goodnow's response was "I guess she could have". (*Id.*, 38:1-4). Goodnow was asked her opinion as a 7-Eleven store manager, with her experience running the register, would it have been possible to place $10 in the register within 4.7 seconds and her response was "[it could be possible. I mean, you could die in 4.7 seconds. I mean, anything's possible

---

[3] Exhibits A-D to Goodnow's second deposition are attached.

in 4.7 seconds". (*Id.*, 38:13-21). Goodnow admitted that 4.7 seconds was sufficient time for Plaintiff to have taken the money out of her left hand and put it in the register and close it. (*Id.*, 39:2-6).

The process was repeated with the Public View and frames 20:04:**24.620** and 20:04:**29.17 (4.397 seconds later),** were depicted on the screen and Goodnow confirmed that **Exhibit "C"** was the same as what was on the screen. (*Id.*, 40:24-41:7,41:8-42:4). Goodnow was shown **Exhibit "D"** which is the two frames in question on Exhibit "B," where there is a 4.397 second lapse between the two frames in question. (*Id.*, 42:5-43:2). Plaintiff notes to the Court that in Exhibit D, you can actually see the money in Plaintiff's left hand in the first frame and in the second frame, ***there is no money whatsoever in Plaintiff's left hand prior to her turning to the left and placing her hand near or in her pocket.*** The jury can draw their own conclusions as to what the video shows and does not show. Goodnow admits that 4.397 seconds was sufficient time for Plaintiff to have been holding the money, open the register, put the money in the register and close it. (*Id.*, 43:2044:23). Plaintiff has requested reinstatement as part of her relief and Defendant has not offered her job back even after all the above was explained. McLeod, Plaintiff's field consultant, has admitted that if Plaintiff didn't steal the money and her drawer wasn't short, then Plaintiff shouldn't have been fired. (*McLeod Dep.* 58:14-16).

It is undisputed that there is almost over four and half seconds missing between the two alleged frames in question where Plaintiff was holding the money in one frame and then turns to the left with her hands near or close to her pocket. (*Goodnow Dep. 2,* 46:1-8). Defendant has argued that Goodnow was not aware of the frame-by-frame

viewing existed and therefore it should not be admissible. However, the frame-by-frame is simply what appears on the surveillance video depicting the 4.730 and 4.397 second lapse which Goodnow noticed but did not cause her any concern. (*Id.,* 20:6-16, 21:14-22:3). In fact, if one were to pause the video on each frame, which Goodnow testified she knew how to operate the program, including hitting the pause button, you would be able to view the two frames in still motion. However, when one is looking for a reason to fire a pregnant employee, Defendant chose not to take the time to view the surveillance video in good faith, but to just terminate Plaintiff's employment for a pre-textual reason of stealing even though there is an obvious gap in the surveillance video.

Of most importance, Goodnow was asked if she had known that the frame-by-frame viewing existed at the time of termination, would she have reviewed it, and she states that ***she probably would not have watched the frame-by-frame anyway***. (*Id.,* 46:19-47:2). In fact, Goodnow's opinion has not changed at all, even after it was made known to her that one can hear the register open and close, she noticed that Plaintiff was standing back from the register when it opened and closed and most importantly, that there is a is a 4.730 and 4.397 seconds respectively missing from both camera angles. (*Id.,* 47:3-25, 61:19-62:7). (Plaintiff submits that this is a position that Goodnow has taken, although unreasonable, in order to maintain her story). The DVD was marked as **Exhibit "E"** to the deposition. (*Id.,* 54:18-24). McLeod, on the other hand, testified that he viewed the surveillance video numerous times and did not see any skipping. (McLeod Dep. 53:10-24). His review was obviously cursory and woefully inadequate as Goodnow

admitted she noticed the video freezing. A belief based upon a woefully inadequate investigation is not an honest and good faith belief.

Goodnow testified that she couldn't recall the shortage of Plaintiff's drawer, but stated that she was sure it was on the EPN. (Goodnow Dep. 90:8-21). However, the EPN does not give the amount of any shortage whatsoever, a copy of Plaintiff's termination paper work is attached as Exhibit "O" to Defendant's Motion for Summary Judgment and incorporated herein by reference. Goodnow can't even remember the amount Plaintiff's drawer was allegedly short, but in fact, the day shortage was not just for Plaintiff's drawer, but for the two registers and six employees that worked that entire day. (Id., 95:11-23).

Defendant's alleged policy on employee theft is an automatic termination. (Goodnow Dep..1, 117:21-23). Defendant stated in its Motion that it has a zero tolerance for theft. However, Ryan Coffrin was caught playing scratch-off tickets prior to paying for them and was not terminated by Defendant. (Coffrin Dep. 12:12-15:12). Goodin testified that he would consider someone playing scratch-off tickets before paying for them stealing. (Goodin Dep. 12:24). Hoffman, would also consider someone playing scratch-off tickets before paying for them stealing. (Hoffman Dep. 9:19-21). Gretchen Hirczak, a co-worker, also testified that she would consider a 7-Eleven employee playing scratch-off tickets before purchasing them stealing. (Hirczak Dep. 11:22-25 Jan. 20, 2012). Steven Smith, one of Plaintiff's prior store managers, also testified that he would consider an employee playing scratch-off tickets prior to paying for them stealing, yet was unaware that Cofrrin had played scratch-off tickets. (Smith Dep. 17:10-18 Jan.20,

2012). However, in direct conflict, Coffrin testified that Smith was aware about it and did not fire him, nor write him up. McLeod, Plaintiff's field consultant, testified that he would consider an employee playing scratch-off tickets before paying for them stealing. (*McLeod Dep.* 16:12-15). Based upon the fact that Defendant has a zero tolerance for theft and therefore does not permit managerial discretion throughout its stores, Coffrin, whom is a male/non-pregnant employee, was not fired for stealing, yet Plaintiff, whom was pregnant at the time, was terminated for stealing.

<u>**Legal Argument**</u>

<u>**Applicable Legal Standard for Summary Judgment**</u>

In determining issues at summary judgment, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his or her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *Slater v. Progress Energy Serv. Co., LLC.,* 8:09-cv-208, 20010, WL 3788824, at \*5 (M.D. Fla. Sept. 24, 2010). Trial courts should act with caution in granting summary judgment and may deny summary judgment where there is reason to believe that the better course would be to proceed to a full trial. *Anderson v. Liberty Lobby, Inc., supra.* Summary judgment will not lie if the dispute about material facts is "genuine" that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248.

**Count I - Plaintiff's Claim for Pregnancy Discrimination under Federal Law**

Count I is based upon the Pregnancy Discrimination Act, 42 U.S.C. §2000e-(k) ("PDA"), an amendment to Title VII. As with the rest of Title VII, disparate treatment pregnancy discrimination may be proven with direct or circumstantial evidence. *Venturelli v. ARC Cmty. Servs.*, 350 F.3d 592, 599 (7th Cir. 2003); *see also Desert Palace, Inv. v. Costa,* 539 U.S. 90 (2003). For the common cases involving circumstantial evidence, the *McDonnell Douglas* formula is applicable for establishing a prima facie case. *McDonnell Douglas Corp. v. Green,* 41 U.S. 792 (1973).

The elements of a prima facie case in a circumstantial evidence case are flexible and must be tailored on a case-by-case basis, to differing factual circumstances. *McDonnell Douglas Corp. v. Green supra.* The elements of a prima facie case for Plaintiff in a pregnancy discrimination case based upon direct evidence are that (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision. *Cline v. Catholic Diocese*, 206 F.3[rd]. 651, 658, (6th Cir. 2000). If one is relying on circumstantial evidence in a disparate treatment case, one must prove that he or she was treated differently than employees that are not members of his or her protected class. *Copley v. Bax Global, Inc.,* 80 F.Supp. 2D 1342 (S.D. Fla. 2000). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

There is no issue in the case at bar about the first three elements of a pregnancy discrimination claim based upon direct evidence – Plaintiff was pregnant, qualified for her job and was terminated. The issue is whether she was terminated because of her

14

pregnancy. Under the circumstantial evidence scenario, Plaintiff needs to show that she was treated differently than members not of her class, i.e., that she was terminated under an accusation of theft, whereas a male employee who actually committed theft was not terminated.

The direct evidence and circumstantial evidence is as follows:

1. Defendant transferred Plaintiff to a more physically demanding store, knowing that she was pregnant.

2. Defendant's manager, Goodnow, the manager who terminated Plaintiff, left a note for Plaintiff demanding that she "scan the beer in the cooler" (which the evidence cited above requires heavy lifting), knowing that Plaintiff was pregnant. Numerous employees, including one manager, testified that they did not think it was appropriate to request a pregnant employee to scan the beer in the cooler.

3. Plaintiff requested assistance in scanning the beer as it required heavy lifting and made it known to management that she required assistance in lifting the beer.

4. Plaintiff was terminated by Goodnow on the next shift she saw Goodnow after she had requested the assistance.

5. The evidence is that lifting and moving the beer was not an essential part of Plaintiff's job duties.

6. A fair inference from the evidence is that Defendant terminated Plaintiff because it was motivated by its view that a pregnant employee, in particular, the Plaintiff, could not perform part of the job even though it admitted that lifting heavy items was not an essential part of the job.

7.  According to Plaintiff's testimony, Goodnow started Plaintiff's termination meeting on May 4, 2010, by stating that Plaintiff's cash register drawer was short $600 to $800 two months earlier and that the money was missing because Plaintiff was pregnant and needed the money because her boyfriend was out of work. This is direct evidence that Defendant had a preconceived notion that because Plaintiff was pregnant and needed the money, that Plaintiff was motivated to steal from the company and concluded that she must have also stolen from the company.

8.  However, Defendant's only proffered reason for the termination was that Goodnow accused Plaintiff at the termination meeting of stealing $10 on April 30, 2010. According to Plaintiff, Goodnow also tied Defendant's pregnancy as a reason for Plaintiff stealing because she needed the money because she was pregnant. This is again direct evidence that Defendant was assuming that because Plaintiff was pregnant, that she needed the money and did in fact steal from the company.

9.  Goodnow told Plaintiff that she has her on a surveillance video taking $10 from a customer, not putting it into the drawer and putting it in her pocket.

10. Goodnow's deposition was taken twice. The surveillance video was used at the second deposition. Goodnow admits and the video establishes that there is over a four and half second gap in the video directly covering the critical time when the audio portion of the video provides the sound of the register drawer opening and closing, yet the video portion of the tape is frozen and missing during this time.

Goodnow admitted at her second deposition that she noticed the missing surveillance video footage prior to her termination of Plaintiff, yet stated she still believes that Plaintiff took the money **The genuine issue of material fact for this case is whether Goodnow's alleged belief was an honest and reasonable good faith belief.** Plaintiff submits that there is substantial evidence of record that Goodnow's belief is not an honest and reasonable good faith belief for at least one or more of the following reasons:

a. Goodnow had a preconceived notion that because of Plaintiff's pregnancy, Plaintiff needed the money and was pre-disposed to steal from the company.

b. Despite Defendant maintaining copious cash register records, the record fails to establish a $10 shortage in Plaintiff's cash register.

c. Despite Goodnow having the expertise, and of having actually noticed the video freezing, she did not reasonably investigate the particular facts that were crucial to her decision, i.e., watching the video in slow motion or pausing it to determine the ramifications of the gap in the video. Goodnow noticed at the time of termination and also at the time of her second deposition that the video was frozen over the critical period of time, but nevertheless testified that she was unconcerned about these particular facts.

d. In addition, the video allows one to easily review the video frame-by-frame in order to actually calculate the time in fractional seconds missing from the video. Goodnow claims that she did not know how to use the video despite her vast experience of reviewing thousands of videos.Defendant claims that Goodnow's

17

ignorance of how to use the video should somehow excuse her inadequate investigation. Even after Goodnow learned that you could watch the video frame-by-frame, she testified that it did not change her opinion that Plaintiff took the money and probably would not have even viewed it frame-by-frame anyway.

e. The ramifications on an employee for allegedly stealing from the employer carry a strong stigma. A termination for allegedly stealing has a more severe effect on an employee's future employability than a termination for poor work performance. Counsel submits that it is arguable to the jury that there is a higher bar to an investigation for allegedly theft than for poor work performance. Defendant's investigation did not come close to what would be a reasonable and good faith investigation in a case dealing with alleged employee theft.

In *Lowe v. Alabama Power Company,* 244 F.3d. 1305 (11th Cir. 2001), the appellate court addressed the employer's defense of a good faith belief in its decision affecting the employee. *Lowe* holds, "[an] employer must point to particularized facts about the specific person's condition to support its decision." *Lowe* cites the Sixth Circuit which also rejected an employer's good-faith belief defenses where it had no legitimate factual basis. *Smith v. Chrysler Corp.,* 155 F.3d. 799, 807 (6th Cir. 1998). *Smith* holds that the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. *Id.* at 807. The *Smith* court further noted that it rejected an application of the honest belief rule that credits an employer's belief without requiring that it be reasonably based on particularized facts. *Id.* at 806. *Lowe* further states that the employer's position in the *Lowe* case was not based on

18

particularized facts using the best available objective evidence as required by regulations. *Lowe.* at 1309.

For the reasons stated above in paragraphs 9 and subparts a-e, a reasonable fact finder could find that Defendant's investigation did not meet the criteria required by the *Lowe* and *Smith* decisions, that its cursory investigation and purported reason for Plaintiff's termination was pre-textual and that the actual reason for Plaintiff's termination was her pregnancy. These are genuine issues of material fact that should be resolved by the jury. Accordingly, Defendant's Motion as to Count I should be denied.

### Count II - Plaintiff's Claim for Pregnancy Discrimination under the FCRA

Defendant has argued in its Motion for Summary Judgment that the Florida Civil Rights Act ("FCRA") does not prohibit pregnancy discrimination and does not provide a pregnancy-discrimination cause of action of its own citing two cases, *Duchanteau v. Camp Dresser & McKee, Inc.,* 10-60712-CIV, 2011 WL 4599837 (S.D. Fla. Oct. 4, 2011) and *Boone v. Total Renal Laboratories, Inc.,* 565 F. Supp. 2d 1323 (M.D. Orlando Division, Fla. 2008). *Duchanteau,* a federal case, acknowledges that the Florida Supreme Court has not resolved the issue of whether the FCRA renders pregnancy discrimination illegal. While two Florida intermediate courts of appeal have issued decisions, they have arrived at opposite conclusions. *Id. O'Loughlin v. Pinchback*, 579 So.2d 788 (Fla. 1st DCA 1991) was decided in 1991 and seventeen years later, *Carsillo v. City of Lake Worth,* 995 So.2d (Fla. 4th DCA 2008), reached an opposite conclusion finding that because the Florida Statute was patterned after Title VII, which considered pregnancy discrimination to be sex discrimination, the Florida Act also bars such discrimination.

19

*Carsillo,* at 1119. This very Court, in the Tampa Division, has followed *Carsillo* and has already decided that the FCRA, which is patterned after Title VII, covers an act of discrimination based upon pregnancy. *Terry v. Real Talent,* 8:09cv-1756, 2009 WL3494476, at *2 (M.D. Tampa Division, Fla. Oct. 27, 2009). This Court concluded in *Terry* that *Carsillo* was more clearly articulated than <u>*O'Loughlin*</u>, which they found to be ambiguous. Accordingly, Defendant's Motion as to Count II should be denied.

<h3 style="text-align:center">Count III and IV - Disability Claims under the ADA and FCRA</h3>

Plaintiff's disability claim is based upon the fact that she was disabled from lifting heavy items during the period of her pregnancy. Although, undersigned counsel acknowledges that Pregnancy, barring unusual circumstances, is a temporary disability, Plaintiff is not required to allege a permanent disability to establish a prima facie case. *Patterson v. Downtown EMD. & Diagnostic Ctr,* 866 F.Supp. 1379, 1381 (M.D. Fla. 1994). The disability law should not be construed to allow an employer to terminate an employee who has a temporary disability, and yet preclude the employer from terminating an employee who has a permanent disability. The Plaintiff's weakened back which prevented her from lifting heavy items qualifies as a disability and substantial impairment, notwithstanding that it was caused by her pregnancy, a short term condition.

Respectfully submitted,

BY: <u>s/ E. Dusty Aker</u>
E. Dusty Aker, Esq

20

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of March, 2012, I electronically filed the foregoing and its attachments with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the CM/ECF participants identified below. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to any non-CM/ECF participants identified at the time of electronic filing.

Welter Law Firm, P.C.
c/o M. Wilson Stoker, Esq.
1141 Elden Street, Suite 220
Herndon, VA 20170

Respectfully submitted,

BY: s/ E. Dusty Aker
E. Dusty Aker, Esq.
Florida Bar No.: 657166
AKER Law Firm, P.A.
240 S. Pineapple, Suite 803
Sarasota, FL 34236
Telephone: (941) 462-2020
Facsimile:  (941) 462-2022
E-mail:Dustyaker@akerlawfirm.com